## Thompson, Appellant, v. Goldman.

278

Argued April 21, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*John F. Naulty*, for appellant.

*Herbert A. Barton*, with him *Ward C. Henry* and *Swartz, Campbell & Henry*, for appellee.

OPINION BY MR. JUSTICE JONES, May 25, 1955:

The plaintiff sued to recover damages for personal injuries sustained in a fall from the roof of the defendant's apartment house. The jury returned a money verdict for the plaintiff. Upon the defendant's motion, the court en banc entered judgment n.o.v. for the defendant on the grounds that the plaintiff failed to establish causative negligence on the part of the defendant and that he was guilty of contributory negligence as a matter of law. The plaintiff has appealed.

Viewing the evidence in the light most favorable to the verdict, the material facts are as follows. The plaintiff was employed as a cement finisher by a building contractor whom the defendant engaged to repair the outside of a window in a bathroom on the third floor of an apartment building owned by her. The building was three stories in height and shared a

party wall with an adjoining building. The first two stories of both buildings, for a portion of their respective widths, extended back some distance beyond the rear wall of the third story. Between these two projections to the rear, there was an areaway or open space extending upward for the full height of the two stories. The third floor bathroom window, which was to be repaired, was directly over the open areaway. On the roof of the two story portion of the defendant's building there was constructed what is commonly called a "flat", that is, a wooden platform fashioned by nailing boards to runners or beams lying on top and along the edge of the roof. The "flat" rested on, but was not physically fastened to, the roof and was, in the plaintiff's words, "used mostly for hanging clothes on." For that purpose, there were several 2″ x 4″ vertical posts attached to the beams lying on the roof. These uprights were connected by two parallel horizontal 2″ x 3″ rails so that the superstructure formed a sort of railing around the outside edge of the "flat". Access to the "flat" or platform was had through a third floor window which opened on to it.

The plaintiff's testimony fully describes the accident in suit. ". . . [T]he boss and I together went to Mrs. Goldman's [the defendant's] house, and I took the plank and the stuff upstairs, and I was going to make a makeshift scaffold from one roof to another. . . [T]he boss was standing in back of me, and I was going to brace myself against this railing. . . . I asked the boss to get hold of the end of [the plank] in back of me until I braced myself, and I was going to push it across the areaway. . . . I did not inspect the railing. . . . I was stooped over. I was going to brace myself and give the plank a shove to the next roof. . . . [A]s I was getting ready to get hold of the plank,

this 2 by 3 [i.e., the lower rail] give way. I didn't have much weight on it at all, and the first thing my boss knew, he was up in the air on one end [of the plank] and I was on the other end. . . . I grabbed hold of the plank . . . and I had all my weight on it, and my fingers just slipped and I fell. . . . I fell straight through the rail."

Assuming, without deciding, that the defendant's failure to inspect the roof platform for defects made her guilty of negligence, the plaintiff's contributory negligence denies him a right to recover.

Contributory negligence is conduct on the part of a plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm: *Good v. Pittsburgh*, 382 Pa. 255, 114 A. 2d 101; *Kovalish v. Smith*, 357 Pa. 219, 53 A. 2d 534; Restatement, Torts, §463. Contributory fault may stem either from a plaintiff's careless exposure of himself to danger or from his failure to exercise reasonable diligence for his own protection: *Good v. Pittsburgh*, supra; Restatement, Torts, §466. In the instant case, the plaintiff's disregard of his own safety and his failure reasonably to protect himself are patent.

By his own admission, the plaintiff knew that the "flat" was not used as a porch but only as a place to hang out laundry. This fact was confirmed by his witness, the tenant of the third floor apartment, who testified that she "used the flat for hanging clothes. That is what it was put up for, to hang my clothes, and I also kept my trash box out there." She further testified that, about six months prior to the accident, she notified the defendant that an upright post, which held a clothes line, was "loose" and "falling". The

defendant hired the plaintiff's employer to make the necessary repairs. And, it was the plaintiff himself who did the actual work of shoring up the sagging post and bracing it to the floor of the platform. The plaintiff freely admitted his previous presence on the "flat"; in fact, a receipt acknowledging payment for "repairing platform flat on third floor" bore his signature.

Despite actual knowledge that the railing was not intended as a restraining barrier such as is ordinarily found on a porch and that, in any event, the railing had been weakened by time and weather, the plaintiff, obviously unmindful of his own safety, proceeded to place his weight against the railing without first testing its solidity. His explanation for not testing the railing was that it "looked solid" to him. But that, of course, does not excuse his admitted failure to ascertain by inspection the real condition of the railing before trusting his weight to it.

The plaintiff's expert witness, who examined the railing after the accident, testified that the part of the rail which the plaintiff had previously braced was "rather firm" but that the side rail (i.e., the one that gave way) was "wiggly . . . it was a trifle wiggly." Certain it is that, if the plaintiff had so much as laid his hand on the rail before placing his weight against it, he would have been at once apprised of its weakened condition. His failure so to do—or to take other precautionary steps—was plain negligence. His consequent injury was, therefore, no less attributable to his own carelessness than to the asserted negligence of the defendant. Having thus acted in open disregard of his own well-being, it is not for him to complain that the defendant did not employ adequate safeguards for his protection. It follows that the learned court below did not err in granting the defendant's motion

for judgment n.o.v. on the alternative ground that the plaintiff was guilty of contributory negligence.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion says that the jury in this case "returned a money verdict for the plaintiff" but it does not indicate how much money. The amount of the verdict was $6,000 which, therefore, represents the money that the plaintiff has lost by the decision of this Court. As I view the case, the plaintiff is being deprived of $6,000 unjustly, that is, contrary to the principles of the law of negligence as laid down in our own decisions and the text books of the land.

On August 23, 1952, the plaintiff, Edward Thompson, and his employer, Anthony Bongart, proceeded to an apartment house at 1305 North Fifth Street, Philadelphia, owned by the defendant Grace S. Goldman, to make certain repairs to a third-story bathroom window which could for the purposes of the repairs, only be reached from the outside of the building. Although the structure was three stories high, the second floor projected out from the rear in such a manner as to give it a separate roof, which roof was utilized as the foundation for a porch or "flat." The word "flat" in this case has a particular meaning entirely unrelated to the usual significance of the word. It means simply a platform surrounded by a railing. Thus, on the second floor roof of Mrs. Goldman's apartment house there was constructed this wooden "flat" (measuring about 14 by 20 feet), which was used mainly for the purpose of hanging and drying clothes, although it also served as a repository for a large trash box. The upright posts supporting the rails around the platform stood approximately from

4 to 6 feet high with a width and depth of 3 by 4 inches. The two horizontal lengths which made up the railing and enclosed the platform measured a width and depth of 2 by 3 inches.

Thompson and Bongart reached this "flat" by passing through a French door which gave out on the platform from an apartment tenanted by Mrs. Clara Malone, who testified at length at the trial. The neighboring building also had a second floor projection whose roof was on the same level as the Goldman second floor roof. The two workmen carried with them a long plank described as a "3 by 10" which they prepared to extend from the "flat" to the roof of the neighboring building to thus make a scaffolding upon which to stand in repairing the bathroom window on the third floor of the apartment house.

Standing on the Goldman roof, Thompson stooped to get the necessary leverage to push the plank over the void to the other roof while Bongart held the plank at the opposite end. Preparing to brace himself to maneuver the heavy timber, Thompson's knee came into contact with the lower rail which pulled loose from the post to which it was attached and Thompson was precipitated into the empty air down to the earth three floors below, sustaining serious injuries. Although the "flat" had been built six years before, it appears that very little, if anything, had been done to maintain it in an assured safe condition. It had never been painted to hold off the rot which is ever ready to seize hold of wood and crumble it to dust; no inspection had been made to determine how it withstood the ravages of time, weather and storm; no examination was conducted to ascertain if the nails were at their duty holding fast against the onslaughts of rust and decay. When Bongart saw his partner disappear over the verge, he descended to

the ground to render assistance and look at the railing which went over the edge with Thompson. He found that the nails which were clinging to the broken wood were "rusted out." He said that two of them had been reduced to a "fine thread," and explained that this deterioration was due to "rain, dampness and staying there a long time."

When Mrs. Goldman, the defendant, engaged Thompson to repair a window in her apartment house she owed him the duty to provide a safe place in which to work. The case of *Newingham v. J. C. Blair Co.,* 232 Pa. 511, 520, had facts similar in principle to the ones which obtain here. In that case the plaintiff was injured when the fire escape, which he had been directed to use in reaching the roof he was to repair, broke because defective. In affirming a judgment returned for the plaintiff, this Court said: "In making use of the fire escape, as directed and required, the plaintiff had a right to rely on the presumption that the defendant had performed its duty in providing a reasonably safe means of access to the roof. The fire escape was under the circumstances to all intents and purposes, an outside stairway. If instead of making use of it, the plaintiff had been instructed to take the inside stairway, and had been injured by the giving way of an improperly constructed platform, it would hardly be contended that the defendant would not be liable for the results. The fact that the fire escape, temporarily transformed at the direction of the defendant into a stairway, was located outside of the building, rather than inside, cannot change the principle involved."

When Mrs. Goldman arranged to have Thompson use the "flat" in order to repair the window, he had the right to rely on the presumption that Mrs. Goldman had performed her duty in providing a reason-

ably safe means of access to that window over the "flat."

In the same *Newingham* case, this Court emphasized the rule which has come down through the centuries of the common law, namely, "All the authorities agree that it is incumbent upon the owner of premises upon which persons come by invitation, express or implied, to maintain such premises in a reasonably safe condition for the contemplated uses thereof and the purposes for which the invitation was extended." (21 Am. & Eng. Ency. of Law (2d ed.) 471.)

In the case of *Hardy v. Phila. Nat. League Club,* 99 Pa. Superior Ct. 326, the plaintiffs were injured when the grandstand in which they were sitting fell because of a defective supporting wooden beam. The Superior Court affirmed a verdict returned for the plaintiffs and said: "We may start with the proposition that the defendant when it invited the public to attend games was required to afford a safe place to sit and view the performances. To assure itself of this, it should have exercised reasonable care in having a proper inspection of the stand at proper times and at seasonable intervals. . . .

"The plaintiffs proved the falling of the stand was caused by a spruce beam being broken. It was not capable by reason of internal rot, to sustain the weight which was upon it."

The Majority declines to state categorically that the defendant in the case before us was proved negligent under the facts, but disposes of the appeal only on the question of contributory negligence, saying: "Assuming, without deciding, that the defendant's failure to inspect the roof platform for defects made her guilty of negligence, the plaintiff's contributory negligence denies him a right to recover." The Majority's conclusion in this respect is based upon an

entirely unfounded premise. It assumes as it says, that because "the plaintiff knew that the 'flat' was not used as a porch but only as a place to hang out laundry," he should know that the railing would have inherent weaknesses and defects. This presupposes the extraordinary concept that a platform with a railing three stories above the ground does not need to be strong if it is used only in connection with hanging out laundry. But in point of objective reality a railing employed for laundry purposes should be as strong, if not stronger, than one enclosing a sitting porch, because in hanging, drying and taking down clothes there is always bound to be a certain amount of leaning against the railing if only in reaching up to apply and remove clothes pins.

The Majority dwells on this erroneous concept that a railing surrounding a platform of the character described need not be sturdy by saying that: "the railing was not intended as a restraining barrier such as is ordinarily found on a porch." There is nothing whatsoever in the record which even hints that the railing was not intended as a "restraining barrier." It would have no purpose other than that of being a restraining barrier. It certainly was not erected for purposes of adornment. It had no beauty, it did not qualify for astronomical purposes. It had only one object, only one reason for existence, and that was to serve as a safeguard. Thus, by every rule of common regard for the safety of mankind, there was a legal, as well as moral, obligation on the part of the owner of the premises to make the railing a substantial one. To erect at such a point a railing which is less strong than one sturdy enough to hold a leaning body is to erect a trap, a pitfall, a snare. A railing which overhangs a dangerous height and is not sufficiently staunch in anchorage and texture to hold back a per-

son who accidentally touches against it is about as treacherous a device as can be found in the whole category of body-breakers.

The Majority says that "the railing had been weakened by time and weather." This observation seems to be offered in extenuation of the defendant's flagrant negligence and in furtherance of the theme of contributory negligence. I would say that if the railing was weakened by time and weather this fact magnifies the fault of the defendant because it placed on her a greater duty to have it inspected and strengthened. There was no obligation on the part of the plaintiff to ascertain how many years the railing was in place. So long as it offered no reasonable evidence of weakness he had the right to assume that he was not being lured to disaster by a false exhibition of security.

The Majority declares that the plaintiff "obviously unmindful of his own safety proceeded to place his weight against the railing without first testing its solidity." There is no evidence that Thompson placed his weight against the railing. Thompson testified: ". . . As I was getting ready to get hold of the plank, this 2 by 3 give way. *I didn't have much weight on it at all . . .*"

The only part of Thompson's body which touched the railing was his knee: "Q. Did you brace your whole body or what? A. No, just my knee. Q. You just braced your knee? A. Yes, sir."

Thompson testified that his weight at the time was 135 or 140 pounds. A railing three floors above the ground that cannot withstand the pressure of a knee of a person who weighs only 140 pounds is an intolerable menace to safety.

The Majority conveys the impression that the plaintiff had actually examined the "flat" and made repairs at the point which brought him to grief. Other-

288

wise, there would be no purpose in the Majority's statement: "The defendant hired the plaintiff's employer to make the necessary repairs. And, it *was the plaintiff himself who did the actual work* of shoring up the sagging post and bracing it to the floor of the platform." *

The Majority even goes on to point out that the plaintiff had signed a receipt for the payment he received for the work: "The plaintiff freely admitted his previous presence on the 'flat'; in fact, a receipt acknowledging payment for 'repairing platform flat on third floor' bore his signature." .

It so happens, however, that this argument of the Majority is entirely irrelevant because the record shows that the previous work which the plaintiff performed was in no way related to the railing which broke and threw him to the ground three floors below. The post which the plaintiff repaired was on the *other* side of the platform. The defendant, Mrs. Goldman, herself testified: "Q. What happened to this matter of the post for the clothing? A. It was on one side, and I happened to see it in the next yard, and I came in and I got in touch with Mr. Bongart to do my sills on the second and third floor; so, while they were doing the work, I told Mr. Thompson to go out on the flat to brace the post up. Q. Did you see that he did it? A. Yes, I seen him, and I came down. BY THE COURT: Q. Which post was that? A. That was *on the other side.* BY MR. HENRY: . . . Q. Where that post is that you have just shown us, with the prop, *was that at the same place that Mr. Thompson fell through?* A. *Oh, no. That was on the other side in the middle. That was not on that side."*

---

* All italics mine.

This attempt to saddle personal responsibility on the plaintiff for the broken device which hurled him into catastrophic injury is surpassed only by the effort to hold him responsible in August, 1952, for what did not happen until six months *later*, in February, 1953. On February 12, 1953, Charles A. Carr, a builder of 40 years experience, examined the "flat" which was involved in the accident. The Majority in referring to his testimony says that Mr. Carr testified "that the part of the rail which the plaintiff had previously braced was 'rather firm' but that the side rail (i.e., the one that gave way) was 'wiggly . . . it was a trifle wiggly.'" After this quotation the Majority makes the astounding statement: "Certain it is that, if the plaintiff had so much as laid his hand on the rail before placing his weight against it, he would have been at once apprised of its weakened condition." The Majority gratuitously assumes that because the railing was "wiggly" in February, 1953, it wiggled six months before on August 23, 1952. This disregards what the record so clearly shows, namely, that the railing which Mr. Carr examined in February, 1953, was *not* the one which gave way in August, 1952. This ignores that the new railing which was erected *after* the accident, and which is the one that Mr. Carr examined, could have been erected and attached differently from the one which injured the plaintiff.

While it is axiomatic in the law that no one should be held responsible for a fault that existed before it was regarded a fault, this is the first time that I have heard of a doctrine which holds a person liable for a set of facts existing in the future. This is indeed *ex post facto* in reverse!

The Majority has apparently treated with complete indifference the undisputed evidence that there is nothing in the record to suggest or intimate that Thomp-

son could know that the railing prior to August 23, 1952, was weak or infirm in any way. The evidence, in fact, is to the exact contrary:

Edward H. Thompson testifying: "Q. As I understand it, there was nothing at all about the railing that indicated to you whether it was safe or dangerous in any particular, was there. A. No. In fact, if it wasn't safe, I wouldn't have braced myself against it."

Clara Malone testifying. "Q. Did you ever report anything wrong with the railing? A. As far as I could see or the eye could see, there was nothing that had the appearance of being anything wrong with it."

Anthony Bongart testifying. "Q. Did you ever see anything the matter with that railing? A. No. I didn't take notice to the railing. The railing looks O.K. to me. Q. And you have spent almost your whole life in making repairs and doing carpentry work, haven't you? A. Yes, sir."

It is important to add that although Mrs. Malone had complained to Mrs. Goldman about one of the posts (the one that Thompson repaired) she never complained about the railing, and certainly she would have been the one most concerned since she is the one who used the "flat" for hanging up clothes:

Mrs. Goldman testifying. "Q. Did Mrs. Malone ever make any complaint to you about the condition of this railing? A. She never said anything to me about no railing."

Thus, every witness who testified to conditions prior to the accident declared that the railing gave every indication of being safe. Yet, the Majority arbitrarily concludes that the railing was obviously unsafe and that, therefore, Thompson the plaintiff committed contributory negligence in accepting as true *what his senses told him was fact.* This is an astounding standard of care that I have not yet found in the law books and therefore, I dissent.