Michael S. HUTCHISON, Jr., by Mary
J. HUTCHISON, Parent and
Natural Guardian

v.

Father Francis LUDDY, St. Therese's
Catholic Church, Bishop James Ho-
gan and Diocese of Altoona–Johns-
town.

Appeal of Catholic Church, Bishop
James Hogan and Diocese of
Altoona–Johnstown.

Superior Court of Pennsylvania.

Argued Jan. 9, 1996.

Filed Oct. 25, 2000.

Reargument Denied Jan. 4, 2001.

Carl A. Eck, Pittsburgh, for appellants.

Richard M. Serbin, Altoona, for Michael S. Hutchison, Jr., appellee.

BEFORE: TAMILIA, FORD ELLIOTT, AND BROSKY, JJ.

BROSKY, J.

¶ 1 This appeal is before us on remand from the Supreme Court with instructions to dispose of all issues not previously ruled upon. The heart of the controversy is the alleged sexual molestation of Appellee Michael Hutchison, a minor male with limited mental competency, by Father Francis Luddy, a Catholic priest. Hutchison, by his mother, Mary J. Hutchison, brought a civil action in June of 1987 to recover damages for the harm allegedly inflicted on him by Luddy. The matter involves an allegation that Luddy's conduct on the two occasions in question was part of a pattern of activity on his part against Hutchison and other minor males, using his status. The evidence showed that Luddy had first molested Hutchison when the latter was ten or eleven years old, and that these molestations continued on a frequent basis until Hutchison's family moved to Ohio in August of 1982. Approximately six months later, in early 1983, Hutchison, now age fifteen, returned to Altoona to meet Luddy in a motel room, performed sexual acts, and received $200 from Luddy. Again, in 1984, the same scenario occurred when Hutchison was seventeen.

¶ 2 The action was brought against not only Luddy but also parties involved in church hierarchy: St. Therese's Catholic Church (St. Therese's), Bishop James Hogan (Bishop Hogan), and the Diocese of Altoona–Johnstown (Diocese), collectively described as the church defendants or the Diocesan Parties. There are two causes of action that form the basis for the suit. The first is, under section 317 of the Restatement (Second) of Torts (1965), that the church organization negligently hired, supervised, and retained Luddy. The second is that pedophilic behavior of priests was deliberately ignored and/or not remediated by the church organization.

¶3 Although the Amended Complaint alleged that Luddy had molested Hutchison over a period of at least six years, Luddy denied having had sexual contact with Hutchison at any time. The church parties raised two defenses in their New Matter. Firstly, they asserted the negligence on the part of Hutchison to care for his own safety should be compared with any negligence on the part of the church parties and should act as a partial or total bar to recovery. Secondly, they asserted the consent on the part of Hutchison to the two actionable molestations allegedly performed on him by Luddy was a total bar to recovery, since Hutchison was over the age of 15 at the time of the alleged incidents.[1]

¶4 After discovery, the church parties filed motions for summary judgment and partial summary judgment. They raised the failure of Hutchison to state a cause of action with regard to the allegation that the church parties engaged in a custom or practice of failing to investigate, report or sufficiently handle complaints of sexual molestation. They also sought to exclude from trial any reference to a duty to report allegations of sexual abuse to any civil authority. The church parties also sought a bifurcation, in the sense that they wanted an initial, separate trial to be held to determine whether Luddy had in fact molested Hutchison within the applicable limitations period.

¶5 The trial court denied these requests and ruled that evidence of otherwise time-barred acts of molestation by Luddy on Hutchison would be admissible at trial. Moreover, the church parties, through *motions in limine*, sought to preclude evidence of molestation committed by other priests of the Diocese and any evidence of other alleged acts of molestation of other minor males by Luddy. The trial judge denied the motions.

¶6 The matter went to an eleven-week jury trial that commenced on January 31, 1994. Hutchison contended that he suf-fered an emotional stress disorder as the result of the long-term sexual abuse by Luddy, leading him to a life of involvement with crime, drugs, and homosexual prostitution. The defense asserted that Hutchison suffered from an attention deficit disorder unrelated to any alleged molestation and that he was a victim of a dysfunctional family.

¶7 The trial judge refused to allow the defense of comparative negligence and refused to instruct the jury regarding the doctrine of consensual agreement as set forth in the church parties' proposed jury instructions. The judge used special interrogatories that provided for the jury to find the church parties liable for either compensatory or punitive damages, or for both types of damages under either the section 317 theory or the pattern or practice theory, or under both theories. With regard to the award of compensatory damages, the special interrogatory-form verdict slip provided each type of compensatory damage for the jury to fill in. The jury was instructed to confine its consideration with regard to Luddy's molestation of Hutchison to incidents of molestation occurring between June 29, 1982 and December of 1984.

¶8 The jury returned its verdict on April 21, 1994. Appellees prevailed against Luddy, St. Therese's, Bishop Hogan, and the Diocese. As to compensatory damages, the jury assigned the following percentages of liability: 36 percent to Luddy, 53 percent to Bishop Hogan and/or the Diocese, and 11 percent to St. Therese's, and assessed a total of $519,000. Regarding punitive damages, the jury found that the conduct of Luddy, St. Therese's, Bishop Hogan, and/or the Diocese was outrageous, in that they acted with reckless indifference to Hutchison's interest. The jury awarded $50,000 in punitive damages against Luddy and $1,000,000 in punitive damages to Hutchison against St.

---

1. On appeal, there is no question that these incidents were not barred by the statute of limitations set forth at 42 Pa.C.S.A. § 5533(b) regarding infancy.

Therese's, Bishop Hogan, and/or the Diocese.

¶ 9 Luddy pursued his own post-trial relief and filed his own appeal with this Court at Docket No. 1452 PGH 94, which was eventually dismissed. The church parties sought post-trial relief, which was denied on June 28, 1994. This order also awarded delay damages to Appellees in the amount of $311,564.11. Judgment was entered on June 30, 1994. On July 25, 1994, the trial court entered an order to clarify its June 28, 1994 order. This order also explained that joint and several liability for punitive damages was not imposed, and that the punitive damages were to be assessed in the amount of $1,000,000 against the church parties and $50,000 against Luddy.

¶ 10 The church parties then filed the instant appeal with this Court on July 29, 1994, raising ten issues. The issues raised in the appeal are as follows.

I. Whether the court erred in allowing [Appellee] to proceed through discovery and trial under the Restatement (Second) of Torts, § 317 (1965), for the negligent hiring, retaining, and supervision of Father Luddy, when the record showed that the molestations occurred in a motel off the premises of the Diocese and there was no proof that Father Luddy was privileged to enter the motel solely because he was employed as a priest and when allowing any such action to go forward would result in excessive entanglement of the courts in the religious affairs of the Diocesan parties?

II. Whether [t]he court erred in allowing [Appellee] to proceed to verdict on the theory that the Diocesan Parties were liable because they had a pattern, practice or custom of ignoring a[sic] failing to investigate and remediate allegations of molestation when no such theory had ever been adopted in Pennsylvania and when [Appellee] failed to prove the existence of any pattern, practice, policy or custom and that if such did exist that it was the animus of Father Luddy's pedophilic behavior?

III. Whether there was sufficient evidence that St. Therese's Catholic Church knew of Father Luddy's pedophilic propensity so as to allow a claim for failing to warn potential victims years after they had moved to another state?

IV. Whether evidence of the failure of the Diocesan Parties to report incidents of child molestation by priests to the police or other civil authorities was admissible[?]

V. Whether the court erred in allowing evidence of other sexual misconduct involving other priests and other victims, Father Luddy and other victims[,] and Father Luddy and the plaintiff?

VI. Whether comparative negligence is a proper defense to a claim against employers or former employers of a pedophilic priest when the plaintiff knew of the priest's pedophilic tendencies as a result of numerous prior instances of his own molestation?

VII. Whether the court's instructions and jury interrogatory on causation were sufficient to enable the jury to decide if the plaintiff consented to the sex acts by engaging in them to obtain money?

VIII. Whether the court erred in submitting a verdict form which requested the jury to itemize the elements of the plaintiff's damages by assigning amounts to each element of the claim?

IX. Whether the evidence was sufficient to warrant an award of punitive damages when the evidence showed nothing more than gross negligence on the part of the Diocesan Parties?

X. Whether the court erred in allowing the jury to decide if punitive damages should be imposed upon St. Therese's Catholic Church if it should

have known of Father Luddy's pedophilic tendencies?

Appellant's Brief at 2–3.

¶ 11 A panel of this Court heard argument on January 9, 1996. This author wrote an Opinion that was filed on September 4, 1996, that looked only at the church parties' first issue. Because of the disposition of that issue, which was a vacation of the judgment against all three of the church parties, this author's Opinion did not continue on to address the other nine issues.

¶ 12 The crux of the first issue was whether liability could properly lie against the defendants under section 317, given the factual circumstances of the case. Section 317 of the Restatement (Second) of Torts provides in pertinent part:

§ 317. DUTY OF MASTER TO CONTROL CONDUCT OF SERVANT

A master is under a duty to exercise reasonable care so as to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) Torts § 317.

¶ 13 This author found that the conduct of Luddy did not meet the requirements of section 317 for imposition of liability because he was acting outside the scope of his priestly duties when he had the alleged encounters with Hutchison in a motel room. This author also noted that Luddy was not on premises that he was privileged to enter only as a servant of the church. Judge Patrick R. Tamilia concurred in this result. Thus, this author concluded that the imposition of liability had to be vacated. *See Hutchison v. Luddy, et al.,* 453 Pa.Super. 420, 683 A.2d 1254 (1996).

¶ 14 Judge Kate Ford Elliott filed a Dissenting Opinion in which she concluded that the evidence at trial established liability under section 317 of the Restatement and that there was no reason to disturb the jury verdict as to liability. Additionally, Judge Ford Elliott found that, as to the punitive damages award, the judgment n.o.v. should have been granted.

¶ 15 Appellee then successfully filed a petition for allowance of appeal with the Pennsylvania Supreme Court. After entertaining argument, the Supreme Court issued a plurality decision. *See Hutchison v. Luddy et al.,* 560 Pa. 51, 742 A.2d 1052 (1999). The Supreme Court's order affirmed our determination that there could be no liability on the part of St. Therese's because that entity's involvement with Luddy had ended prior to the incidents in question. Thus, its liability was barred by the statute of limitations. *Id.,* 742 A.2d at 1056. However, the Supreme Court vacated our order with regard to the judgment n.o.v. in favor of Bishop Hogan and the Diocese. The Supreme Court ruled that the jury's verdict against those parties was legally sustainable on the basis of liability under section 317. The matter was remanded to us for consideration of issues raised by Bishop Hogan and the Diocese (collectively Appellants) in their appeal to this Court but not addressed previously by the panel. Thus, we turn to the remaining issues in Appellants' Original Brief, which ask this Court to reverse the trial court's refusal to enter a judgment n.o.v. or to award a new trial.

¶ 16 Our standard of review of the trial court's refusal to enter a judgment n.o.v. is as follows:

A judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. *Atkins v. Urban Redevelopment Authority of Pittsburgh*, 489 Pa. 344, 414 A.2d 100, 103 (Pa.1980). We must view the evidence in the light most favorable to Michael Hutchison as verdict winner, giving him the benefit of every reasonable inference of fact arising therefrom. Any conflict in the evidence must be resolved in his favor. *Broxie v. Household Finance Company*, 472 Pa. 373, 372 A.2d 741, 745 (Pa.1977). It is important to note that a reviewing judge's, or justice's, "appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations." *Brown v. Shirks Motor Express*, 393 Pa. 367, 143 A.2d 374, 379 (Pa.1958); *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1007 (Pa.1992).

*Hutchison*, 742 A.2d 1052, 1062 (Cappy, J., concurring).

¶ 17 Further, our Supreme Court has explained:

There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, *Tremaine v. H.K. Mulford Co.*, 317 Pa. 97, 176 A. 212 (1935), and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant, *Cummings v. Nazareth Borough*, 427 Pa. 14, 233 A.2d 874 (1967). With the first[,] a court reviews the record and concludes that[,] even with all factual inferences decided adverse to the movant[,] the law nonetheless requires a verdict in his favor, whereas[,] with the second[,] the court reviews the evidentiary record and concludes that the evidence was such that a

verdict for the movant was beyond peradventure.

*Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003, 1007 (1992).

¶ 18 Moreover, we observe the following standard of appellate review of the trial court's decision on a motion seeking a new trial.

The grant or refusal of a new trial will not be reversed on appeal, absent an abuse of discretion or error of law which controlled the outcome of the case.

*Anzelone v. Jesperson*, 436 Pa. 28, 258 A.2d 510, 511 (1969). *See also Morrison v. Commonwealth, Department of Public Welfare*, 538 Pa. 122, 646 A.2d 565, 571 (1994).

¶ 19 Addressing Issue I on remand, Appellants first ask us to decide whether constitutional considerations bar this matter. Appellants contend that the doctrines of excessive entanglement and religious autonomy, precluding the state from interfering with church affairs under the First and Fourteenth Amendments of the United States Constitution, bar a court decision concerning Appellants' negligent hiring, supervising, and retaining of its clergy under section 317.

¶ 20 Appellants did not raise either the doctrine of excessive entanglement or religious autonomy as a defense in the trial court proceedings, nor did they present these concepts before the trial court for resolution. They only asserted the First Amendment in the context of the discovery of archived documents. In their brief, Appellants discussed the doctrine of excessive entanglement, but that discussion was buried in a sketchy footnote. We hold that the constitutional concerns are not properly before us for review. *See Riedel v. Human Relations Comm'n of Reading*, 559 Pa. 34, 739 A.2d 121, 123 (1999) (stating that issues not preserved for appellate review will not be addressed by the appellate court); *Kalenevitch v. Finger*, 407 Pa.Super. 431, 595 A.2d 1224 (1991) (stating that issues not raised before the trial

court may not be raised for the first time on appeal but are waived); Pa.R.A.P. 302.[2]

¶ 21 On remand, Appellants argue that the matters of excessive entanglement and religious autonomy are considerations that pertain to subject matter jurisdiction and may be raised at any time in the proceedings. Appellants are asking this Court, an intermediate appellate court, to revisit a decision made by our Supreme Court[3] by couching the request in terms of subject matter jurisdiction. If valid, Appellants' argument would have prevented this Court and the Supreme Court from even engaging in an inquiry as to whether a cause of action exists for the remedy being sought when a religious organization is being sued.

¶ 22 Our Supreme Court has stated:

A court has jurisdiction of the subject-matter if it is empowered to enter upon an inquiry for the competent hearing and determination of a controversy of such character. That a court may, in view of facts pleaded or proven, be unable ultimately to grant the relief sought does not necessarily determine that it is without jurisdiction of the subject-matter[.] The thing of chief importance on a question of jurisdiction of subject-matter is not whether the plaintiff may recover in the particular forum on the cause of action pleaded but whether the court is empowered to hear and determine a controversy of the character involved[.]

*Upholsterers' International Union v. United Furniture Workers*, 356 Pa. 469, 52 A.2d 217, 219 (1947) (citations omitted). *See also Strank v. Mercy Hospital of Johnstown*, 376 Pa. 305, 102 A.2d 170 (1954) (stating, regarding subject matter jurisdiction, that the law must make the court competent to entertain the particular controversy); *Sperry & Hutchinson Co. v. O'Connor*, 488 Pa. 340, 412 A.2d 539 (1980) (same). Further, our Supreme Court has stated:

[E]ven though a plaintiff [has] no standing to bring his action, even though his complaint be demurrable, even though he fail[s] to establish its allegations, even though the court should finally conclude that the relief he seeks should not be granted, not any of these circumstances would enter into, much less determine, the question whether the court had jurisdiction of the litigation.

*Studio Theaters, Inc. v. City of Washington*, 418 Pa. 73, 209 A.2d 802, 804 (1965).[4]

**2.** Appellants cite *Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897 (1966), to support their raising the constitutional issues for the first time on appeal. In *Kuchinic*, our Supreme Court recognized that a litigant who fails to raise an objection at trial ordinarily waives it on appeal. However, the Court stated that there may be a circumstance where an Appellant's failure to inject an objection into a trial may not be treated as a waiver because an objection prior to the appeal would have been to no avail. That is not the situation in the present case.

**3.** In the Opinion Announcing the Judgment of the Court, Justice Newman observed that Appellants had waived any constitutional issues, including free exercise of religion or establishment of religion. *See Hutchison*, 742 A.2d at 1053 n. 2. Justice Castille, in his Dissenting Opinion, further explained that the Supreme Court was moving forward into ruling on the issue of section 317 liability because the constitutional issue was not before the Court.

**4.** While some courts have addressed the issue of excessive entanglement as a jurisdictional matter, as Appellants assert, these cases were employment disputes. *See, e.g., Ratko v. Free Serbian Orthodox Church St. Nicholas*, 191 Ariz. 120, 952 P.2d 1190 (App.1998); *Diocese of Galveston–Houston v. Stone*, 892 S.W.2d 169 (Tex.App.—Houston 1994); *Young v. Northern Illinois Conference of United Methodist Church*, 21 F.3d 184 (7th Cir.1994); *Farley v. Wisconsin Evangelical Lutheran Synod*, 821 F.Supp. 1286 (D.Minn.1993); *Lewis v. Lake Region Conference of Seventh Day Adventists*, 779 F.Supp. 72 (E.D.Mich.1991); and cases cited therein.

The cases cited by Appellants concerning sexual misconduct by clergy looked at whether excessive entanglement barred the existence of a cause of action for negligent retention and supervision of a clergy. *See Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis.2d 302, 533 N.W.2d 780 (1995) (indicating that the First Amendment makes a claim against a Roman Catholic Archdiocese, by a female

¶ 23 The trial court was the appropriate tribunal for a plaintiff to bring an action to recover in negligence against another party for retaining and supervising a particular employee under section 317. Had Appellants advanced to the trial court that it was unable to grant relief because of excessive entanglement and religious autonomy concerns, this assertion would have borne only on the court's ability to grant a remedy, not on the court's ability to entertain the controversy in the first instance.

¶ 24 Although the constitutional question would make for intriguing analysis, our Court and the Supreme Court have observed that this question was not properly raised for appellate review in this case. Thus, as Justice Castille noted, the decisions in this matter were based on the premise that a cause of action for section 317 liability would lie if the factors set forth in section 317 were met. The issue of whether there should be no cause of action permitted for negligent retention when a church and its clergy are involved is a question left to another day, when it has been properly developed for appellate review. *See Riedel, supra.*

¶ 25 Further, we point out that our Supreme Court has ruled on the issue of section 317 liability, treating the constitutional issues as waived, and has remanded this matter to us with instructions that did not include engaging in an exploration of First Amendment concerns. The doctrine of the law of the case precludes us from disrupting the Supreme Court's decision and directives. *See Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995) (stating that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter). This tenet of the law of the case doctrine has long been expressed with regard to remand situations. In *Haefele v. Davis*, 380 Pa. 94, 110 A.2d 233, 235 (1955), our Supreme Court stated:

> A lower court is without power to modify, alter, amend, set aside or in any manner disturb or depart from the judgment of the reviewing court as to any matter decided on appeal.... Under any other rule, litigation would never cease, and finality and respect for orderly process of law would be overcome by chaos and contempt.

*Id.* We therefore will not engage in an exploration of the constitutional issues on remand.

¶ 26 Next, we address Issue II in Appellant's Original Brief, which is:

**II. Whether [t]he court erred in allowing [Appellee] to proceed to verdict on the theory that the Diocesan Parties were liable because they had a pattern, practice or custom of ignoring a[sic] failing to investigate and remediate allegations of molestation when no such theory had ever been adopted in Pennsylvania and when [Appellee] failed to prove the existence of any pattern, practice, policy or custom and that if such did exist that it was the animus of Father Luddy's pedophilic behavior?**

Appellant's Original Brief at 2. Appellants ask us to rule on a number of concerns as part of this issue. First, we must decide whether the submission of the cause of

---

who allegedly was sexually abused by a priest while she was a high school student, for negligent hiring and retention of the priest, incapable of enforcement by the courts). *See also Swanson v. Roman Catholic Bishop of Portland*, 1997 Me. 63, 692 A.2d 441 (Me.1997) (refusing, on First Amendment grounds, to impose a secular duty of supervision on the church and to enforce that duty through civil liability with regard to section 317); *Gibson v.*

*Brewer*, 952 S.W.2d 239 (Mo.1997) (refusing to recognize a tort cause of action, under section 317, of negligent failure to supervise clergy). *See also Smith v. Privette, et al.*, 128 N.C.App. 490, 495 S.E.2d 395 (1998) (rejecting argument that trial court lacked subject matter jurisdiction, because of excessive entanglement, to entertain a matter against a religious organization concerning negligent retention and supervision of a clergy).

action for the church organization's ignoring or failing to remediate situations with problem priests was erroneous because this cause of action is not recognized in Pennsylvania. If we conclude that the cause was erroneously submitted to the jury, Appellants ask us to conclude that there was no basis for punitive damages in this case, because section 317 will not support their imposition. Further, Appellants argue that the submission of evidence to support the pattern or practice theory was erroneous and tainted the trial with regard to section 317. This argument necessarily entails our concurrent consideration of Issue V, which is:

**V. Whether the court erred in allowing evidence of other sexual misconduct involving other priests and other victims, Father Luddy and other victims[,] and Father Luddy and the plaintiff?**

Appellant's Original Brief at 3.

¶ 27 The trial judge explains in his Opinion on the post-trial motions that he allowed the pattern or practice theory to be submitted to the jury as a factual consideration with regard to the assessment of punitive damages. The trial judge did not make a ruling on whether there is a cognizable cause of action for the pattern or practice theory of liability, however. Regardless of the trial judge's justifications, both section 317 and the pattern or practice theory were submitted to the jury as alternate theories for imposing compensatory damages and/or punitive damages. *See* questions 5, 6, 7, and 8 on Verdict Slip.

■ ¶ 28 Appellee asserts that Count Six of the Amended Complaint, regarding the pattern or practice theory, set forth allegations of intentional conduct on the part of the church defendants. Our research reveals that, heretofore, there has been no such cause of action recognized in Pennsylvania. However, although we are not bound by out-of-state decisions, we may turn to them for guidance as statements of common law. *Commonwealth v. Channell*, 335 Pa.Super. 438, 484 A.2d 783, 787 n. 4 (1984). From a review of the cases cited by Appellee and our own research, it does not appear that a cause of action for intentional failure to supervise a clergy is a cause of action engrained in common law. *See Gibson v. Brewer*, 952 S.W.2d 239 (Mo.1997); *Gray v. Ward*, 950 S.W.2d 232 (Mo.1997); and *Mrozka v. Archdiocese of St. Paul and Minneapolis*, 482 N.W.2d 806 (Minn.App.1992).[5]

■ ¶ 29 We reject Appellee's invitation to expand the existing causes of action for tort liability in Pennsylvania to include

---

**5.** In *Gibson*, the Supreme Court of Missouri, while declining to recognize a tort for negligent supervision of a clergy under section 317 because of excessive entanglement, recognized a tort of intentional failure to supervise a clergy, finding that such a tort would not violate the First Amendment. *Id.*, 952 S.W.2d 239, at 247. The Missouri Court required a showing that: 1) the supervisor or supervisors of the clergy existed; 2) the supervisor or supervisors knew that harm was certain or substantially certain to result; 3) the supervisor or supervisors disregarded this known risk; and 4) the supervisor's inaction caused the damage. *Id.* The *Gibson* Court found that the facts in that case established the cause of action.

*Gray* was also a case decided by the Supreme Court of Missouri on the same day as *Gibson*. The Court in *Gray* relied on the holding in *Gibson* to find error in dismissing the tort of intentional failure to supervise a clergy but had not erred in dismissing the negligence tort on First Amendment grounds. *Id.*, 950 S.W.2d 232, at 233.

*Mrozka* was a case decided by the Court of Appeals of Minnesota centering on the propriety of an award of punitive damages against a religious organization and in favor of a victim of child sexual abuse who had also been awarded compensatory damages. The action had been brought on the basis that the religious organization negligently allowed the plaintiff to be sexually abused as a minor. The organization admitted negligence and a jury awarded both compensatory and punitive damages. On appeal, the organization argued that the award of punitive damages violated the public policy of Minnesota and that the award was unconstitutional and contrary to the evidence. The matter of recognizing a cause of action for an intentional tort of the type advanced by Appellee in the present matter was not at issue.

intentional failure to supervise a clergy. *See R.A. v. First Church of Christ*, 748 A.2d 692, 700 (Pa.Super.2000) (refusing to recognize a cause of action based on the Restatement (Second) of Torts §§ 299A and 328A for ministerial malpractice).[6]

¶ 30 As an intermediate appellate court, we do not enunciate new precepts of law or expand existing legal doctrines, since that province is reserved to our Supreme Court. *Moses v. T.N.T. Red Star Exp.*, 725 A.2d 792, 801 (Pa.Super.1999); and *Houston v. Texaco, Inc.*, 371 Pa.Super. 399, 538 A.2d 502, 505 (1988) (stating that we are charged with applying the law as it has been pronounced by the Supreme Court).[7] As former Judge Berle M. Schiller of this Court astutely observed, "it is not 'desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time but whose birth is distant.'" *Stonehedge Square Ltd. v. Movie Merchants, Inc.*, 454 Pa.Super. 468, 685 A.2d 1019, 1026 (1996) (*quoting Spector Motor Service, Inc. v. Walsh*, 139 F.2d 809, 823 (2d Cir.1943) (Hand, J. dissenting), vacated, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944)). We therefore hold that there is no such cause of action recognized in this Commonwealth and we decline to create one, leaving that to the Supreme Court, if appropriate.

¶ 31 Appellant's concern regarding the need for a cognizable cause of action to support the assessment of punitive damages is well-founded. This Court has previously explained that it is axiomatic that a claim for punitive damages arises out of the underlying cause of action and, absent a viable cause of action, an independent claim for damages may not stand. *Costa v. Roxborough Memorial Hospital*, 708 A.2d 490, 497 (Pa.Super.1998). *See also Houston*, 538 A.2d at 505 (stating that punitive damages may not be recovered in the absence of a legally recognized injury). Therefore, without a recognized cause of action for the intentional tort theory to submit to the jury, there was no basis for an award of either compensatory or punitive damages on that theory. *See id.*

¶ 32 Additionally, it is also problematic that the cause of action under section 317 is based on ordinary negligence. It is well established in Pennsylvania case law that punitive damages may not be awarded for misconduct that constitutes ordinary negligence. *See Houston*, 538 A.2d at 505 (citing, *inter alia, Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 748 (1984)). As the federal district court for the Eastern District of Pennsylvania has recognized in a recently published opinion, a negligent supervision claim based on section 317 and based on *Dempsey v. Walso Bureau*, 431 Pa. 562, 246 A.2d 418 (1968), does not support a claim for punitive damages. *Mullen v. Topper's Salon and Health Spa, Inc.*, 99 F.Supp.2d 553 (E.D.Pa.2000).[8] Such a cause of action, one based on section 317 and *Dempsey*, is what our Supreme Court has upheld here.

¶ 33 Thus, it follows that the cause of action for a practice or pattern was not cognizable as a basis for a claim for punitive damages and section 317 could not

6. The elements adopted in the *Gibson* decision might provide a basis for a cause of action for intentional failure to supervise a clergy that would include the practice or policy theory to be recognized in Pennsylvania. However, in the absence of any guidance from our Supreme Court, we are reluctant to fashion such a cause of action based on *Gibson*.

7. With this conclusion, we do not address Appellants' contentions concerning the inapplicability of an analogy to civil rights law embodied at 42 U.S.C. § 1983, and the private right of action somewhat akin to section 1983 found in a proposed statute before our Legislature advanced in Appellants' Supplemental Brief.

8. We are not bound by decisions of federal courts construing state law. *Rader v. Turnpike Comm'n*, 407 Pa. 609, 182 A.2d 199, 203 (1962); *Clay v. Advanced Computer Applications, Inc.*, 370 Pa.Super. 497, 536 A.2d 1375, 1380 (1988), *rev'd in part on other grounds*, 522 Pa. 86, 559 A.2d 917 (1989).

support a claim for punitive damages, either. There was no recognized theory of liability in this case that would allow the jury to award punitive damages. We hold that the consideration of punitive damages should not have been submitted to the jury, since the only valid cause of action, section 317 liability, does not support the imposition of punitive damages. Appellee should not have been awarded punitive damages. Therefore, the trial court should have entered a judgment n.o.v. as to punitive damages. We reverse the trial court's refusal to enter a judgment n.o.v. as to the award of punitive damages.

¶ 34 But, we do not find that the submission of evidence of pedophilic behavior within the church organization to support the alternate cause of action was erroneous or tainted the trial such that a new trial is required. A panel of this Court recently explained the basic concepts regarding the admissibility of evidence as follows:

The admission or exclusion of evidence ... is within the sound discretion of the trial court. Thus, our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but [must] also [be] harmful or prejudicial to the complaining party.

The basic requisite for the admission of any evidence is that it be both competent and relevant. Evidence is competent if it is material to the issues to be determined at trial, and relevant if it tends to prove or disprove a material fact in issue. The question of whether evidence is relevant and, therefore, admissible, rests within the sound discretion of the trial court and will not be reversed on appeal absent a showing that the court clearly abused its discretion. It is the court's function to exclude any evidence which would divert attention from the primary issues in the

case, thus the trial judge has broad discretion regarding the admissibility of potentially misleading or confusing evidence.

*Turney Media Fuel, Inc. v. Toll Bros.*, 725 A.2d 836, 839 (Pa.Super.1999) (citations omitted). Further, with regard to the admissibility of evidence, this Court has stated:

A trial court may properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury. However, "prejudice" for the purposes of this rule, does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis. In Pennsylvania, the trial judge has broad discretion regarding the admission of potentially misleading and confusing evidence.

*Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584, 588 (1984) (citations omitted).

¶ 35 In the motions *in limine*, Appellants asserted that prior pedophilic behavior by Luddy, or involving priests other than Luddy, would have only slight probative value, but would be unduly prejudicial, likely to confuse the jury, and a considerable waste of time. The trial judge rejected this argument. Trial Court Opinion, 1/12/94, at 3.

¶ 36 Appellants' actual or constructive knowledge of Luddy's pedophilic activities was a material issue to proof of their liability under section 317. In order to establish liability pursuant to section 317(2)(b), Appellee had to establish that the Diocese and the Bishop knew or had reason to know that it had the ability to control Luddy. Appellee also had to prove that they knew or should have known of the necessity and opportunity for exercising such control. The trial judge reasoned that, to meet this required showing, Appellee had to establish that the Appellants had some form of notice. Thus, it was important for Appellee to show what other

incidents of molestation had occurred involving Luddy and/or involving other priests who may have been similarly situated within the Diocese.

¶ 37 When one looks to the evidence that the church defendants sought to preclude in this case, it is obvious why they so strenuously object to its admission. This evidence shows a long history of sexual molestation by Luddy on individuals other than Hutchison and on Hutchison himself. It also shows numerous instances of repeated pedophilic activities by a certain few priests in the Diocese of which Bishop Hogan had been made aware prior to the incidents that form the basis for the action in this case. While this activity was that of a few priests, the evidence shows that the Diocese and Bishop Hogan had known about it for some time, and should have been more appropriately responsive to the Luddy situation.

¶ 38 Evidence of alleged molestation of other minor males by Luddy, dating back to 1968 or 1969, and of his molestation of Hutchison, both prior to 1982 and afterwards, was presented and admitted. Evidence concerning Appellants' knowledge about Luddy's activities was also presented and admitted. We must look to this evidence in order to determine whether the trial judge correctly ruled that its prejudicial impact did not outweigh its probative value.

¶ 39 Luddy was ordained as a priest of the Diocese in 1967 and did not leave until asked in May of 1987, following the allegations concerning this appeal. Hogan was the Bishop of the Diocese from July of 1966 until May 20, 1987, during Luddy's entire tenure.

¶ 40 Luddy's first molestation of a minor male occurred when Luddy was an associate pastor at St. Mark's Roman Catholic Church in Altoona. The boy had reported the sexual abuse to the pastor at St. Mark's, Father Mulvehill, sometime between 1967 and 1969. Luddy last had contact with that boy in 1970, after he had been transferred to St. John's Cathedral in Johnstown for reasons unrelated to sexual activity.

¶ 41 The second boy with whom Luddy had sexual relations was from a family of parishioners at St. Mark's. Luddy met a third boy in 1972, when Luddy was assigned to St. John's, and became sexually involved with him.

¶ 42 Luddy was transferred to St. Therese's in February of 1975. Just prior to Luddy's transfer to St. Therese's, Bishop Hogan received a letter from Luddy's Vicar General, Monsignor Thomas Madden, who was the pastor at St. Patrick's Cathedral, that set forth unpriestly behavior noted on the part of Luddy. The Vicar General is directly beneath the Bishop in church hierarchy. Monsignor Madden demanded that Luddy be transferred. Monsignor Madden wrote that he knew that Luddy had a drinking problem, but he suspected that a deeper malaise was causing Luddy to turn to alcohol.

¶ 43 The evidence showed that Luddy had developed a problem with alcoholism beginning in 1968 and continuing until 1982. Monsignor Madden had observed problems with Luddy's behavior, *e.g.*, tardiness, disappearances from the rectory until the wee hours of the morning, and driving problems involving possible hit and run activity. Monsignor Madden had attributed these problems, which he described as a failure to fulfill obligations, to a Peter Pan syndrome, meaning Luddy was immature. He knew nothing of the pedophilic activity specifically. Monsignor Madden wrote to Bishop Hogan concerning Luddy's problems. Bishop Hogan responded by informing Luddy that his behavior was intolerable. Luddy promised to stop drinking and was transferred to St. Therese's.

¶ 44 At approximately this same time, Monsignor Philip Saylor, who was assigned to St. John's in Lakemont, received a report that Luddy's predecessor at St. Therese's was accused of molesting someone at the church, and assumed it was a

minor boy. The complaint was from the mother of the molested person. Monsignor Kline was supervising this priest at St. Therese's. There was no evidence to prove that the transferred priest was a good friend of Luddy. Monsignor Saylor went immediately to Bishop Hogan with the allegation. Bishop Hogan was on his way for a vacation, and he asked Monsignor Saylor to send the priest away for psychiatric help. The priest was sent for out-patient psychiatric treatment.

¶ 45 The next young man with whom Luddy became involved was Michael Hutchison's brother, Mark. Luddy became involved with Mark Hutchison in the spring of 1977, when Luddy was assigned as an assistant pastor at St. Therese's. Monsignor Kline, who was Luddy's supervisor at St. Therese's, was aware that Luddy would take the Hutchison brothers to his room at the rectory to watch television and had seen Michael alone with Luddy before going to Luddy's bedroom. Monsignor Kline admitted that he should have known, through his own observations, that Luddy was engaged in sexual activity with minor males. Bishop Hogan was surprised to hear that Monsignor Kline was not aware of the sexual activity between Luddy and the Hutchison brothers.

¶ 46 Luddy continued to molest Mark Hutchison until September of 1980, approximately a month after he had been reassigned to be the pastor at St. Mary's Church in Windber. Mark Hutchison reported the sexual abuse by Luddy to Father Gabrielle Zeis, a Franciscan priest who is not with the Diocese, in 1981 and Father Bernard Gratten, a priest in the Diocese, between 1981 and 1983. Father Zeis met with Mark Hutchison and his mother about the allegations, and Mark Hutchison left the meeting believing that Father Zeis was going to contact Bishop Hogan about the problem.

¶ 47 The last minor male with whom Luddy had sexual contact, other than Hutchison, was a boy with whom he was involved in 1985.

¶ 48 Evidence as to whether Bishop Hogan was aware of the molestation of minor males by other priests, dating back to 1979, and by Luddy prior to being contacted by Hutchison's mother in 1987, and of his decisions on what to do about these reports, was also presented and admitted.

¶ 49 Upon receiving the first complaint about a priest in 1979, Bishop Hogan confronted the priest with the allegation. The priest denied the allegation that he had rubbed his penis on a ten-year-old boy's feet. Bishop Hogan did not consider the allegation to be pedophilic behavior, and he transferred the priest to another church.

¶ 50 Seven years later, in 1986, Bishop Hogan began receiving additional similar complaints about that same priest from his pastor, Monsignor Kiniry, who stated that both he and the parish school's principal had been receiving complaints for over six months. This priest was sent for treatment, but remained an active priest in the Diocese until Hogan retired in 1987.

¶ 51 There was a second priest about whom Bishop Hogan received complaints of unpriestly behavior beginning in 1972. In March of 1984, Bishop Hogan received two letters from parishioners, but, rather than contacting the parishioners, he contacted the priest. The priest admitted to sexual involvement with children but stated that nothing sloppy had occurred with the boys. Bishop Hogan gave the second priest a good dressing down. Bishop Hogan took no further action until the Pennsylvania State Police became involved. Bishop Hogan wrote a letter to the second priest and directed him to keep his big mouth shut with regard to his having sexually molested the boys. Bishop Hogan sent this second priest away from the parish for professional help.

¶ 52 There was also a third priest in the Diocese about whom Hogan received notification of pedophilic activity in 1982. Bishop Hogan confronted the priest and attributed the matter to an isolated falling

apart. The third priest admitted to having engaged in a number of sexual acts over a period in excess of a year with a fifteen-year-old boy. The only allegation made by the boy that the priest denied to Bishop Hogan was that he engaged in sodomy. Bishop Hogan took the priest's word that he could correct the problem, and he took no action toward him except to check on him at his parish seven to eight times in the following five years. Hogan admitted that the allegations concerning the three priests turned out to be true.

¶ 53 When parishioners made complaints about Luddy's drinking in 1982, Father Wadas, another priest of the Diocese, confronted Luddy. At this time, Luddy was assigned to serve under Monsignor Madden at Cathedral of the Blessed Sacrament in Altoona. After that point, Luddy stopped drinking.

¶ 54 On April 27, 1987, Hutchison's mother contacted Hogan concerning Luddy's acts on her son, Michael, and her other son, Mark. Hogan testified that this was the first point in time that he learned of Luddy's molestation of any minor male. Hogan contacted Luddy on May 1, 1987 concerning the phone call he had received from Hutchison's mother. This was the first time that Luddy had been contacted by anyone concerning his activities. Luddy denied any involvement with Michael but admitted involvement with Mark.

¶ 55 On May 9, 1987, Hogan met with Hutchison's mother and his brother, Mark. For the first time, Hogan learned that the Hutchisons had confidentially reported the molestation of Mark to Father Zeis at a Boy Scout retreat in 1981. Father Zeis testified that he had told Mark Hutchison and his mother that he would only contact Hogan with their permission. Father Zeis also testified that he never received permission.

¶ 56 After hearing Mrs. Hutchison's complaints substantiated and Luddy's admission of improper sexual contact with Mark Hutchison, Hogan ordered Luddy to leave St. Mary's parish immediately and report to a facility to receive treatment.

¶ 57 The evidence concerning prior acts of molestation by Luddy had the potential to be inflammatory. However, it was also important to an assessment of credibility, where Luddy was denying having had sexual relations with Hutchison. Relying on *United States v. Fawbush*, 900 F.2d 150 (8 th Cir.1990), Appellants submit that the jury was so prejudiced by the inflammatory evidence of other pedophilic activity by Luddy, aside from the two incidents in question, that it was unduly influenced in rendering the verdict.

¶ 58 In *Fawbush*, the appellant/defendant was facing criminal charges involving sexual abuse of two very young girls. The prosecution was permitted at trial to present testimony of Fawbush's two adult daughters, each of whom testified that he had also sexually abused them as children, and had even impregnated one of them at age fifteen. The Court of Appeals, applying Federal Rule of Evidence (F.R.E.) 404(b) with regard to other act evidence, reversed. The Eighth Circuit refused to find that the challenged evidence was relevant to show that Fawbush was engaged in a plan or that it was relevant to a material issue. Also, the Eighth Circuit was concerned that the testimony was relevant only to show the appellant/defendant's propensity to commit such acts, which is improper use of such evidence, and that its prejudicial effect outweighed any legitimate probative value.

¶ 59 *Fawbush* is distinguishable from the present case. Firstly, Fawbush was charged with several crimes. Unlike the church parties here, he was not facing civil liability for allegedly failing to control improper conduct known or should have been known to be occurring. Secondly, we are not applying F.R.E. 404(b). Also, we are not bound by decisions of federal courts inferior to the United States Supreme Court. *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 39 (1998).

¶ 60 In fact, we have located cases within our own jurisdiction that, although criminal matters, support the admission of inflammatory details of prior acts of rape and child sexual abuse, within the trial judge's discretion. In *Commonwealth v. Luktisch*, 451 Pa.Super. 500, 680 A.2d 877 (1996), the appellant was charged with molesting his stepdaughter. Testimony of uncharged similar acts of molestation on the defendant's natural daughter was held admissible and more probative than prejudicial in proving, by a common plan, scheme, or design, that the defendant had molested his stepdaughter fourteen years later. This was especially so where the victim's credibility was undercut by defense testimony.

¶ 61 In *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310 (1995), evidence that the defendant in a homicide case had abducted, raped, and attempted to murder another woman was necessary and limited to demonstrating a common plan, scheme, or design. The Supreme Court held that the prejudice from this evidence did not outweigh its probative value.

¶ 62 In *Commonwealth v. McMaster*, 446 Pa.Super. 261, 666 A.2d 724, 730 (1995), evidence that four-year-old girl, an alleged victim of child sexual abuse, had contracted gonorrhea of the throat was properly admitted as the only independent evidence that the child had been victimized. We pointed out that the evidence was critical because the victim's testimony was being attacked as incredible. We further reasoned that the infection was only one piece of evidence of the defendant's guilt, and that the jury had been so informed.

¶ 63 Appellants are asking us to put blinders on to other act evidence criminal cases that arose in this Commonwealth and were decided contrary to the outcome in *Fawbush*, but we will not so limit ourselves. The evidence that was offered and admitted, as set forth above, was obviously repugnant and distasteful and had an inflammatory potential. However, this type of evidence in any matter regarding rape or child sexual abuse is always repugnant. We find no abuse of the trial court's discretion in ruling that the probative value of the evidence of Luddy's other acts of molestation outweighed its prejudicial effect.

¶ 64 Further, the evidence concerning pedophilic behavior in the church also had the potential to be inflammatory. However, the evidence was highly probative to the question of section 317 liability on the part of the church defendants, as it showed the church organization's knowledge, or lack thereof, with regard to the church parties' failure to control Luddy. With regard to evidence of pedophilic behavior within the organization, we find instructive an analogous argument raised in a civil matter cited in Appellee's Substituted Brief on Remand. That case is *General Equipment Manufacturers v. Westfield Insurance Co.*, 430 Pa.Super. 526, 635 A.2d 173 (1993), wherein a subcontractor filed suit against a general contractor for nonpayment, and attempted to introduce evidence of the general contractor's failure to pay other subcontractors. On review of the propriety of the admission of such evidence, we stated as follows:

> While the commission of an act charged cannot be proved by showing the commission of a like act at a different time, an exception to this rule exists where knowledge or intent is a material fact to be proved. Under such circumstances, evidence of similar acts or transactions is admissible when relevant to prove an issue in the case. Accordingly, evidence of a course of conduct or dealing followed by a person may be admitted to prove that he acted in accordance with it on a given occasion, provided such a course of conduct or dealing is shown to have been continuous and systematic.

*General Equipment*, 635 A.2d at 185 (Pa.Super.1993) (citations omitted).

¶ 65 The course of dealing of the church organization with pedophilic behavior within the church, if any, could tend to estab-

lish how the church reacted to Luddy's pedophilic behavior if the church organization knew or should have known about it. Luddy testified that his fear of losing a parish could have been affected by the church's having a policy of not acting on complaints of pedophilia, and, in this way, could have affected his engaging in sexual acts with minor males. The trial judge appropriately pointed out that the church defendants would have sought to introduce the evidence that they were challenging if its use would have been more beneficial to them. As an example, the trial judge cited an instance where the church defendants would want to use such evidence to show that they could have had no notice, because Luddy was the only priest engaged in pedophilic behavior. Trial Court Opinion, 1/12/94, at 7.

¶ 66 Thus, we agree that such evidence was probative of section 317 liability on the part of Appellants. The prejudicial impact of the evidence concerning the knowledge of Appellants concerning pedophilic activity of priests within the Diocese was not so prejudicial as to outweigh its probative value. We find no abuse of discretion on the part of the trial court in ruling that the probative value of the evidence concerning the pedophilic behavior of priests of the Diocese other than Luddy and that the church defendants' knowledge thereof outweighed its prejudicial effect.

¶ 67 Although not raised in a separate issue, Appellants contend that the trial court could have "greatly reduced the potential for prejudice by bifurcating the case, as requested by the Diocesan parties." Brief for Appellants at 64, n. 10.[9] They submit that the trial court should have first tried only the issues of whether the two single episodes involving Luddy and Michael occurred, without permitting introduction of other evidence related to other sexual misconduct. If the jury found that Luddy did commit one or both acts, then a second trial could proceed on the remaining issues of liability and damages.

¶ 68 A trial court's decision whether to bifurcate issues at trial may not be disturbed by this Court on appeal absent an abuse of discretion. *Santarlas v. Leaseway Motorcar Transport Co.*, 456 Pa.Super. 34, 689 A.2d 311, 314 (1997); *Coleman v. Philadelphia Newspapers*, 391 Pa.Super. 140, 570 A.2d 552, 555 (1990). A decision on bifurcation requires careful consideration by the trial court, which must "be alert to the danger that evidence relevant to both issues may be offered at only one-half of the trial." *Stevenson v. General Motors Corp.*, 513 Pa. 411, 521 A.2d 413, 419 (1987). "[B]ifurcation should be carefully and cautiously applied and be utilized only in a case and at a juncture where informed judgment impels the court to conclude that application of the rule will manifestly promote convenience and/or actually avoid prejudice." *Id.* at 419 (quoting *Brown v. General Motors Corp.*, 67 Wash.2d 278, 282, 407 P.2d 461, 464 (1965)).

¶ 69 The trial court explained that Appellants' motion to bifurcate did not simply seek to sever the issues of liability from issues of damages. Instead, Appellants sought to try a single liability issue, namely whether Luddy committed the two single acts. Then, if Appellee succeeded in establishing one or both incidents, Appellants proposed to determine the remaining liability issues, *i.e.*, the negligent supervision claim, as well as damages.

¶ 70 The trial court noted that this case rested entirely upon the credibility of the various witnesses, all of whom would have been common to each of two separate

9. Appellees argue that this issue has not been preserved for appeal, as it was not included in the Statement of Questions Presented. It is true that this particular argument is not framed by Appellants as a separate issue, but rather appears within the context of Issue V.

However, we note that Appellants did raise this argument before the trial court, which addressed the issue in its Opinion in support of the denial of post-trial motions. We decline to find this issue waived, and instead proceed to decide it on the merits.

trials. It gave consideration to whether there would be any benefit to separate trials as proposed by Appellants, and it concluded that precisely the same evidence required to establish Luddy's liability would be presented in a second proceeding. The trial court also considered that the motion to bifurcate was made less than two weeks prior to the start of trial, after completion of considerable preparation and planning by the parties and the court in anticipation of the lengthy trial. Finally, the trial court concluded that bifurcation would not further any convenience nor avoid any prejudice to any party as contemplated by Pa.R.C.P. 213.

¶ 71 We conclude that the trial court gave adequate and careful consideration to whether bifurcation was appropriate in this case. Although the only actionable incidents here were those after June 29, 1982, we agree with the trial court that Luddy's conduct is so intertwined with the remaining issues presented in this case that bifurcation was not warranted. The evidence of other acts of molestation by Luddy on Hutchison was the only evidence that could show that the two pedophilic incidents actually occurred. Moreover, the evidence of the molestation acts of other priests and Luddy's molestation of other boys was critical to proving the church parties' notice of Luddy's pedophilic conduct. We find no abuse of its discretion in denying Appellants' request.

¶ 72 The remaining consideration presented by Issue II for us to resolve is, therefore, whether the submission of this theory to the jury had a prejudicial impact requiring the award of a new trial. The trial court found that it did not, because the evidence introduced to support the pattern or practice theory bore on the knowledge requirement of section 317 and on the matter of whether punitive damages were appropriate.

¶ 73 Appellants contend that the admission of policy or practice evidence injected a "foreign theory" into this case, and was irrelevant to the issues to be decided. Appellee asserts that he was not required to prove both theories of liability in order to be entitled to an award of compensatory damages. He urges that, since section 317 liability would have supported an award of compensatory damages in itself, the submission of the alternate theory of liability, and evidence to support the theory, does not require that the verdict be disturbed. In support of this argument, Appellee relies on Thompson v. Anthony Crane Rental, Inc., 325 Pa.Super. 386, 473 A.2d 120 (1984); and Thompson v. City of Philadelphia, 507 Pa. 592, 493 A.2d 669 (1985).

¶ 74 In Anthony Crane, the appellee-plaintiffs brought an action against a company that rented out a crane and a power company to recover damages for injuries that the husband-plaintiff sustained when the boom of a crane that he rented struck high voltage wires on the premises of the power company. Separate theories of strict liability and negligence were submitted to the jury in separate special interrogatories. A panel of this Court found that the plaintiffs' strict liability case against the crane rental company did not depend upon the actual proof of a defect but on the mere occurrence of a malfunction. Under such a circumstance, the panel found that it was inconsistent for the trial court to permit the plaintiff to proceed to a jury on the strict liability claim when he also advanced a theory that human intervention had caused the harm.

¶ 75 However, although this Court in Anthony Crane found that the trial judge had erred in submitting the strict liability issues to the jury, we found that the grant of a judgment n.o.v. was unwarranted. We reasoned that the court had used special interrogatories and that sufficient evidence supported the jury's finding of negligence. Moreover, since the trial court had separately explained both the negligence and strict liability theories of liability and had used special interrogatories, avoiding confusion, we concluded that the fact that the judge had instructed the jury on both

theories of recovery did not create a ground for a new trial.

¶ 76 In *City of Philadelphia*, the question before the Supreme Court was whether and under what circumstances a trial court may order a new trial for the apportionment of damages under the doctrine of comparative negligence. *City of Philadelphia* was a wrongful death and survival action against a number of defendants based on a traffic death. The jury apportioned liability among the defendants and awarded a total amount of damages. The trial judge found that the jury's apportionment of responsibility among the defendants was against the weight of the evidence. This Court found that the jury's apportionment could have been justified. The Supreme Court reversed, upholding that the trial judge's conclusion in deciding to award a new trial and remanding for a new trial limited to apportionment of negligence. The Supreme Court noted that it found no error in the trial court's refusal to grant a judgment n.o.v.

¶ 77 Although we find *City of Philadelphia* is distinguishable on the basis that it involved errors in allocating negligence among responsible parties, not error in submitting multiple theories of liability to the jury, we cannot agree that *Anthony Crane* is distinguishable from the present case. In this case, as in *Anthony Crane*, the trial judge used special interrogatories and separately instructed the jury with regard to the alternate theories of liability. Further, as in *Anthony Crane*, there was sufficient evidence to support the jury's finding as to one of the theories of liability, the section 317 liability.

¶ 78 While we have held that no cause of action for the pattern or practice theory is recognized in the Commonwealth, we do not agree that a new trial is required. Simply because evidence has been presented in support of a cause of action which is later determined not to be viable does not mean that same evidence was not also relevant and properly admissible for some other purpose, as is the case here. We disagree with the contention that this evidence injected a "foreign theory" or otherwise was irrelevant to the jury determination of liability pursuant to section 317.[10] Contrary to Appellants' contention, this lawsuit was not simply about two discrete incidents involving Luddy and Michael, and Appellants' liability has never been premised on those two isolated occurrences. The crucial issue with respect to Appellants' liability is their knowledge when confronted with signs that Luddy was engaging in improper conduct. Liability could attach to Appellants only if the jury determined that they "knew or should have known" that they should exercise control over Luddy. Whether Luddy was the first known priest-pedophile with whom Appellants had experience is clearly relevant to a determination of whether they "should have known" about his improper conduct at some point prior to Michael's unfortunate experiences. Clearly an individual or organization which has been exposed to and has had some experience in dealing with a particular situation may better be able to recognize a subsequent, similar situation. Therefore, we reject Appellants' assertion that there was a prejudicial taint in this matter such that the jury could not arrive at a proper verdict. Accordingly, with regard to Issues II and V, the only matter for which we enter a judgment n.o.v. and reverse the trial court's order is the assessment of punitive damages.

---

10. We note that the trial court stated that it also admitted this evidence as relevant to the jury's determination of Count Six and punitive damages. As we have concluded that the issue of punitive damages was improperly submitted to the jury, this reasoning of the trial court was erroneous. However, we also recognize that where the result is correct, an appellate court may affirm the decision of the trial court on any ground. *McNamara v. Thomas*, 741 A.2d 778, 783 n. 5 (Pa.Super.1999). Thus the fact that the trial court also gave an improper reason for admission of the disputed evidence does not affect our decision on this issue.

¶ 79 With St. Therese's relieved of liability, we need not address Issue III in their original brief, *supra*. We therefore turn to the issue of whether the trial court erred in admitting evidence of the failure of the Diocese to report incidents of sexual abuse to appropriate authorities. Issue IV is:

**IV. Whether evidence of the failure of the Diocesan Parties to report incidents of child molestation by priests to the police or other civil authorities was admissible[?]**

Appellant's Original Brief at 2.

¶ 80 In Issue IV, Appellants contend that the trial court erred in permitting the introduction of evidence that the Diocesan parties did not report incidents of sexual abuse to the police or other civil authorities. Appellants first contend that this evidence was not relevant to any fact at issue, because they had no duty to make such reports, and that their failure to do so was not probative of whether they also failed to adequately investigate reports of sexual abuse. Further, they submit that, even if this evidence was relevant, its prejudicial effect outweighed its probative value.

¶ 81 The trial court concluded that, while the Diocesan parties had no duty to report such incidents to police or other authorities, the evidence was nonetheless relevant to the jury's assessment of damages. Appellee argues that the evidence is more precisely relevant to and probative of Appellants' knowledge of improper conduct. We agree with Appellee.

¶ 82 Appellants refer to several instances in the testimony where Appellee's counsel asked Bishop Hogan whether he ever reported incidents of sexual misconduct to police or other agencies. The Bishop stated that he had not. During the Bishop's testimony, the trial court gave a cautionary instruction to the jury, informing it that there was no duty or requirement that he report such an incident to the police. N.T., 3/14/94 at 45. Additionally, in its charge to the jury at the conclusion of the trial, the court stated as follows.

I want to emphasize something to you in terms of your deliberation as to any investigation that the Church Defendants may or may not have conducted as you determine it to be. The Church Defendants had no legal duty to report activities of a pedophilic natures to law enforcement authorities or to children or youth services or to government agencies. And any failure to do so [—] that can't be a basis for finding them liable under these theories. This testimony was permitted to be placed before you to permit plaintiffs to exclude those courses of action in terms of the investigation that the defendants did conduct as being possible steps that they took. So in other words, it isn't a basis for liability and yet, whether they did do it or whether they didn't do it as part of their investigation.... Outside their own internal operation they didn't have to do that, okay? They were under no legal duty to do that and you now know that they didn't. So you can examine it clearly from the standpoint in determining their policies and determining what they did, what they didn't do, *what they knew, what they didn't know,* in terms of the other evidence that you heard.

N.T., 4/19/94 at 80–81 (emphasis added).

¶ 83 As we have previously set forth, the admission of evidence is a matter left to the discretion of the trial court. *Turney Media Fuel, supra.* Evidence which is competent (material to the issues at trial) and relevant (tending to prove a material fact in issue) may be admitted at the discretion of the trial court. *Id.* If reports had been made, certainly such evidence would tend to establish knowledge on the part of the person or entity making that report. Conversely, an inference favorable to Appellants could be drawn from the fact that no such reports were made.

¶ 84 We thus conclude that the evidence that no reports were made to police or other authorities by Appellants was rele-

vant to a determination of whether they knew or should have known that such incidents were occurring. The extent of Appellants' actual or constructive knowledge was an issue material to whether they were negligent in supervising Father Luddy, and thus formed the basis of Appellee's cause of action against them under section 317. Accordingly, this evidence was both competent and relevant to a material issue, and therefore admissible subject to the trial court's sound discretion.

¶ 85 That leads to Appellants' additional contention that the prejudicial nature of this evidence of failure to report outweighed its probative value. It must be remembered that this case was replete with evidence that could be considered inflammatory and emotionally charged. Simply because evidence is unfavorable to a party does not render it more prejudicial than probative, however. *Daset Mining Co, supra.* The trial court correctly instructed the jury on two occasions on the limited purpose for which this evidence was received. This jury was also specifically told that the Diocesan parties did not have a duty to make any such reports. Our review of the record leads us to the conclusion that the relatively brief evidence did not unduly tend to suggest a decision on an improper basis. *Id.* We therefore find no abuse of discretion constituting reversible error in admitting the evidence.

¶ 86 Next, we address Issue VI, which is:

**VI. Whether comparative negligence is a proper defense to a claim against employers or former employers of a pedophilic priest when the plaintiff knew of the priest's pedophilic tendencies as a result of numerous prior instances of his own molestation?**

Appellant's Original Brief at 3.

¶ 87 Appellants contend that the trial court erroneously excluded the doctrine of comparative negligence from this case. Appellants assert that, under 42 Pa.C.S.A.

§ 7102, they had a right to raise comparative negligence as a defense. The negligence they wish to compare is that of the Appellants under section 317, for negligent hiring, retention, and supervision of Luddy, with the asserted negligence on the part of Hutchison in acting to ensure his own safety from Luddy's molestations. Appellants urge that Hutchison was in a better position than were they to prevent the two harmful contacts and that he knowingly placed himself in a position of danger. They point out that Hutchison came from Ohio to meet Luddy in the motel on the two occasions in question. Accordingly, Appellants argue that a new trial should be awarded because the trial court removed comparative negligence from the case.

¶ 88 The doctrine of comparative negligence, as adopted by Pennsylvania, provides:

(a) **General rule.**—In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

42 Pa.C.S.A. § 7102.

¶ 89 This Court, in *McMeekin v. Harry M. Stevens, Inc.*, 365 Pa.Super. 580, 530 A.2d 462, 464 (1987), stated that this provision is aimed only at actions brought to recover damages for negligence. The comparison involved in the statute is only to be for an action grounded in negligence. *Id.* Further, we have explained:

comparative negligence attempts to balance two equal forms of conduct[,] and[,] in so doing[,] allocate the cost in terms of whose action was most responsible for the injury. To involve a comparison of

unequal forms of conduct would not fit within this scheme. *Krivijanski v. Union R. Co.*, 357 Pa.Super. 196, 515 A.2d 933, 938 (1986). When willful or wanton misconduct is involved, comparative negligence should not be applied. *Summit Fasteners v. Harleysville Nat.*, 410 Pa.Super. 56, 599 A.2d 203, 206 (1991).

¶ 90 Appellants' brief is of little help to us in ruling on this issue. Appellants cite four cases for the proposition that a plaintiff owes a duty to himself to avoid dangerous behavior on his own part. In *Thompson v. Goldman*, 382 Pa. 277, 114 A.2d 160 (1955), the Supreme Court held that an employee who knew that a railing was weak yet placed his weight against it was guilty of contributory negligence. In *Miller v. Erie*, 340 Pa. 177, 16 A.2d 37 (1940), the Supreme Court held that a fifteen-year-old boy was guilty of contributory negligence for injuries sustained when a pillar fell, and he and others were sitting on a chain between it and another pillar. In *Pratt v. Stein*, 298 Pa.Super. 92, 444 A.2d 674 (1982), the plaintiff failed to disclose a pre-existing back condition when his medical history was taken. This Court held that there was ample evidence that a medical malpractice plaintiff was not contributorily negligent. Further, the Court held that the trial court did not err in refusing to instruct the jury on contributory negligence. In *Trayer v. King*, 241 Pa.Super. 86, 359 A.2d 800 (1976), this Court affirmed the conclusion that plaintiff, an injured pedestrian, was contributorily negligent. We have reviewed these cases and find them of no value in our inquiry here, since the decisions did not involve sexual abuse-type activity.

¶ 91 As Appellee points out, the problem that we have here is that the conduct that is alleged to have harmed Hutchison is the pedophilic sexual abuse by Luddy that the church allegedly negligently allowed to occur by its supervision and retention of Luddy. The core of the conduct that allegedly harmed Hutchison, thus, is pedophilic sexual abuse. The conduct of the church parties allegedly was a substantial factor in bringing about the harm. Against this Appellants ask us to compare Hutchison's breach of a duty to avoid endangering himself.

¶ 92 For several reasons, we share the trial court's concern about entering into a comparison of the parties' respective negligence in this case. First, it is problematic that Luddy's conduct is central to the negligent acts alleged on the part of the Appellants. In the context of liability insurance coverage, our Supreme Court has stated that pedophilic sexual abuse is intentional conduct on the part of the abuser, as a matter of law, and is not negligent conduct. *General Accident Ins. Co. v. Allen*, 547 Pa. 693, 692 A.2d 1089, n. 10 (1997) (citing *Erie Ins. Exchange v. Claypoole, et al.*, 449 Pa.Super. 142, 673 A.2d 348 (1996)). In *Erie*, which involved allegations that a school bus driver sexually molested minors, this Court found that injuries resulting from sexual assault on children in cases of sexual molestation are intentional as a matter of law. We stated,

> To hold otherwise would be the equivalent of characterizing the sexual molestation of children as a negligent act caused by being in the wrong place at the wrong time instead of characterizing it as an intentional act resulting from the repugnant conduct of the molester.

*Erie*, 673 A.2d at 356.

¶ 93 Applying this concept to the case before us, we agree with Appellee that, since Luddy's acts of pedophilic sexual molestation were intentional, the doctrine of comparative negligence has no application here. The acts that directly caused the harm are, in essence, what must be compared. Luddy's intentional act and the alleged negligence of Hutchison are not equal forms of conduct. As we have stated *supra*, comparative negligence is only an appropriate consideration in matters where there is negligence on the part of both the plaintiff and the defendant involved in causing the harm that results, not where the conduct of one is willful.

¶ 94 A second concern that we share with the trial court is that Appellants cite no cases, nor did our research reveal any case law, holding that the victim of sexual abuse has a duty to avoid placing himself/herself in the position to be harmed. Our Supreme Court in *Althaus v. Cohen*, 756 A.2d 1166 (Pa.2000), recently explained that the legal concept of a duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society. *Id.* at 1169. The Court stated:

> The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty on the actor; and (5) the overall public interest in the proposed solution.

*Id.* We agree with the trial judge's decision that there is no sound reason from the standpoint of public policy for creating law to hold a victim of alleged sexual abuse by a priest who fails to put a stop to the abuse has breached a duty to himself. *See* Trial Court Opinion, 3/14/95, at 228. Accordingly, we affirm the decision of the trial judge to exclude the doctrine of comparative negligence from this case.

¶ 95 We next address Issue VII, which is:

**VII. Whether the court's instructions and jury interrogatory on causation were sufficient to enable the jury to decide if the plaintiff consented to the sex acts by engaging in them to obtain money?**

Appellant's Original Brief at 3.

¶ 96 Citing section 892 of the Restatement (Second) of Torts, concerning the meaning of consent, Appellants allege that Hutchison's consent to the two alleged incidents was a viable defense for the church defendants. Appellants assert in their brief that, during the trial, they introduced evidence that would support a conclusion that the incidents in 1983 and 1984 were initiated by Hutchison and that he consented to the incidents to obtain money from Luddy. They argue that, if the jury believed this conclusion, then a defense of Hutchison's consent to the molestations at issue and/or assumption of the risk would have been established.[11] Further, Appellants claim that this conclusion would have established that there was no causal connection between any acts or omissions of the church defendants and Hutchison's alleged injuries. Appellants argue that the trial judge's instructions to the jury did not adequately cover these considerations, and that the trial judge erred in declining to use the proposed instructions that Appellants offered, such that a new trial is required.

¶ 97 Our Supreme Court explained the following in *Stewart v. Motts*, 539 Pa. 596, 654 A.2d 535 (1995):

> [O]ur [standard] of review is to determine whether the trial court committed clear abuse of discretion or error of law controlling the outcome of the case. Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error. A reviewing court will not grant a new trial on the adequacy of the charge unless there is a prejudicial omission of something that is basis or fundamental. In reviewing a trial

---

11. Although Appellants include a mention of assumption of the risk, they devote the discussion in their brief to the concept of consent only. Thus, we do not discuss assumption of the risk.

**850**

court's charge to the jury, we must not take the challenged words out of context of the whole of the charge, but must look to the charge in its entirety.

*Stewart*, 654 A.2d at 540 (quotations and citations omitted).

¶ 98 The question of whether a jury should be instructed on a given point depends upon the facts and the issues in a particular case. *Sprague v. Walter*, 441 Pa.Super. 1, 656 A.2d 890, 921 (1995) (*citing Ferrick Excavating and Grading Co. v. Senger Trucking Co.*, 506 Pa. 181, 484 A.2d 744, 748 (1984)). A trial court has wide latitude in charging the jury, and the court may use any particular language, provided that the language used adequately and fully conveys to the jury the law applicable to the facts of the case. *Kearns v. Clark*, 343 Pa.Super. 30, 493 A.2d 1358 (1985). A trial court's refusal to use the exact language supplied by the parties is not necessarily a ground for reversal where the trial court adequately covered the pertinent legal issues. *Pagesh v. Ucman*, 403 Pa.Super. 549, 589 A.2d 747 (1991).

¶ 99 The trial judge explains in his opinion on the post-verdict motions that the instructions did adequately allow for the jury to make a finding on consent. Trial Court Opinion, 6/28/94, at 231. The trial judge instructed the jury, with regard to question 2 on the verdict slip concerning causation, as follows.

> You see the Plaintiff may not recover money damages if all the harm you find resulted from a meeting which the Plaintiff had initiated and arranged for the express purpose of soliciting, asking for, sexual contact in return for money. Now here we're not talking about a gift of money given after a sexual assault at the Defendant's—as part of the Defendant's guilty conscience. We're not talking about that. We're talking about a planned sexual meeting in return for money by the Plaintiff. That's what we're talking about in that particular respect. So that question is important

for two reasons. The determination of harm. The determination of the role of Father Luddy's conduct.

N.T., 4/19/94, at 47–48.

¶ 100 Further, he explains that the Pennsylvania Standard Suggested Civil Jury Instructions, at Chapter XII 13.00 Defenses to Intentional Torts, admonish that a trial judge should not give an instruction on consent to an intentional tort except with regard to medical cases. *Id.* The trial judge was satisfied that the instruction he gave directed the jury's attention, immediately after concluding that the acts had occurred, to the question of causation in general, which would subsume the question of Hutchison's consent. The trial judge explains:

> [we] told the jury that this Plaintiff could not recover in a sex-for-money scenario if the jury were to conclude that is what occurred. The possibility that what occurred in the Townhouse Motel on one or both occasions was an act of prostitution was one possible interpretation that the jury might reach based on all the testimony. Accordingly, we believe [that the] Church Defendants were entitled to have this possible interpretation put before the jury in the manner stated above on this issue. This was well[-]argued in closing arguments by all sides, and we supported it by the charge.

Trial Court Opinion, 3/14/95, at 130–31.

¶ 101 Appellants quote at length section 892 of the Restatement and cite no case support. The true basis for their argument is a concern that the judge's instruction and special interrogatories dealt only with the question of whether Luddy's conduct resulted in any harm to Hutchison. *See* Verdict Slip at 2. They take the position that this did not adequately provide for the jury to take into consideration whether Hutchison's conduct in engaging the sexual activity in question was consensual.

¶ 102 Appellee, on the other hand, asserts that any harm from the course selected by the trial judge resulted to him, not Appellants. He cites two criminal matters involving the sexual assault of a minor, in which it was stated that consent involves a submission, but submission by no means necessarily means consent. *See Commonwealth v. Todd*, 348 Pa.Super. 453, 502 A.2d 631 (1985); *Commonwealth v. Tuck*, 169 Pa.Super. 35, 82 A.2d 288 (1951). This Court in *Todd* observed that the age and mentality of the subject of a sexual assault is always important and should be considered in determining the presence or absence of consent. Here, these considerations were before the jury to weigh in determining whether Hutchison consented to the molestation for money.

¶ 103 We find no error on the part of the trial court. The issue of whether Hutchison had consented to them went to the larger matter of whether or not he was, in fact, harmed. If he consented and wanted the outcome of sexual Luddy's advances, then the jury would have concluded that he was not harmed. The charge as a whole provided a sufficient and correct legal basis to guide the jury in its deliberations as to whether the alleged molestations were harmful to Hutchison. Therefore, we find that there was no error on the part of the trial judge requiring an award of a new trial.

¶ 104 Next, we consider Issue VIII, which is:

**VIII. Whether the court erred in submitting a verdict form which requested the jury to itemize the elements of the plaintiff's damages by assigning amounts to each element of the claim?**

Appellant's Original Brief at 3.

¶ 105 In Issue VIII, Appellants contend that the trial court erred in providing the jury with a verdict slip that set forth the categories of damages separately. That itemization appeared in question 10 of the Verdict Slip which, as completed by the jury, is as follows.

10) State the amount of damages, if any, sustained by Plaintiff, Michael Hutchison, Jr.:

| | | |
|---|---|---|
| a) | Future psychiatric and/or medical expenses | $500,000.00 |
| b) | Pain and suffering including emotional distress: past, present and future | $ 10,000.00 |
| c) | Embarrassment and humiliation | $ 0 |
| d) | Loss of enjoyment of life | $ 9,000.00 |
| | TOTAL COMPENSATORY DAMAGES | $519,000.00 |

The Verdict Slip also asked for the determination of punitive damages in separate questions, but Appellants concede that compensatory and punitive damages must be determined separately.

¶ 106 Appellants argue that ordinarily in a civil case, juries are not asked to itemize damages. They assert that separate awards are the exception, and should be limited to those unique cases where a legitimate reason exists for such specific findings. Appellants also attempt to distinguish the cases cited by Appellee in which itemized verdict slips were used, contending that none of those cases specifically addressed the propriety of their use.[12]

¶ 107 The essence of Appellants' argument is we "should not condone the use of line-item verdicts." Brief for Appellants at 73. They cite no pertinent legal authority for this assertion, instead speculating that "mischief" and inconsistencies could result from requiring itemization, and that

12. *See Lewis v. Pruitt*, 337 Pa.Super. 419, 487 A.2d 16 (1985) (jury awarded economic and non-economic losses separately in action seeking damages from automobile accident pursuant to No-Fault Act); *Williams v. Dulaney*, 331 Pa.Super. 373, 480 A.2d 1080 (1984) (same); *Krock v. Chroust*, 330 Pa.Super. 108, 478 A.2d 1376 (1984) (jury verdict properly awarded damages for wrongful death action separately from survival action; however, it was impossible to determine whether survival action award encompassed both economic and non-economic damages, because no special verdict used). *See also Riddle v. Anderson*, 481 A.2d 382, 383 (Pa.Cmwlth. 1984) (new trial required where itemized verdict slip reflected that jury failed to award damages for lost earnings despite uncontradicted testimony supporting the loss).

jurors might feel compelled to award higher verdicts.

¶ 108 Because Appellants have failed to cite any pertinent legal authority to support this contention, we could consider it waived. *Jara v. Rexworks Inc.*, 718 A.2d 788, 796 (Pa.Super.1998), *appeal denied,* 558 Pa. 620, 737 A.2d 743 (1999). However, in an effort to thoroughly address all of the issues remaining on remand, we shall review this argument on the merits.

¶ 109 The trial court explained that it has always been its practice to use such "line-item" verdict slips, and that in its experience, itemization of damages has been informational and instructive. The trial court also concluded that, from its review of the Verdict Slip, it was evident that the jury understood its task and properly evaluated the Appellee's damages in each category. *See* Trial Court Opinion, 3/14/95, at 109–11, 167–69.

▮▮▮ ¶ 110 Appellants contend that applicable case law in this Commonwealth does not support or endorse use of such a verdict. However, Appellants have not cited to any legal authority that finds disfavor in itemization. To the contrary, this Court has previously acknowledged: "[i]f special findings [on a verdict] would add to a logical and reasonable understanding of the issue, it is within the discretion of the trial judge to grant such a request." *Krock, supra* n. 10, at 1381. Our Supreme Court and the Commonwealth Court have also had occasion to examine itemized verdicts where effective appellate review was only possible because the damage awards were separately categorized. *See Catalano v. Bujak*, 537 Pa. 155, 642 A.2d 448 (1994) (personal injury action where nine separate categories of damages were itemized on the verdict slip, and Supreme Court affirmed verdict for plaintiff); *DeVita v. Durst*, 167 Pa.Cmwlth. 105, 647 A.2d 636 (1994) (personal injuries resulting from automobile accident where the verdict slip contained itemization for ten separate damage categories, and Commonwealth Court affirmed verdict for plaintiff). We

therefore reject the argument that itemized damage awards are unrecognized and/or improper in Pennsylvania.

▮▮▮ ¶ 111 Additionally, Appellants argue that the circumstances of this case did not warrant the jury's itemization of damages. However, Appellants have failed to advance any reason to support their contention that use of this particular verdict was erroneous. Appellants' speculation, that problems such as inflated awards could arise when a jury is asked to itemize damages, is not a sufficient basis from which to conclude that the trial court abused its discretion. Review of the Verdict Slip establishes that this concern is unfounded in this case. The jury's award for future medical and psychiatric expenses is well within the estimated (and uncontradicted) range of costs for that treatment given in the testimony. Additionally, the panel determined no damages were warranted for embarrassment and humiliation, which negates Appellants' concern that a jury might be compelled to enter an award for each separate item of damages. Moreover, Appellants do not argue that the award for compensatory damages is excessive, either as a whole or on separate consideration of questions 10(a), (b), (c) and (d). It is thus apparent that Appellants' mistrustful predictions of the effects of itemized verdict slips never materialized in this case.

¶ 112 We conclude that Appellants have failed to establish an abuse of discretion by the trial court, or that any prejudice to them resulted from use of the itemized verdict slip in this case. We therefore find this issue to be without merit.

¶ 113 Because of the conclusion that a claim for punitive damages should not have been submitted to the jury, we need not address Issues IX and X in Appellant's Original Brief, which are:

**IX. Whether the evidence was sufficient to warrant an award of punitive damages when the evidence showed**

nothing more than gross negligence on the part of the Diocesan Parties? X. Whether the court erred in allowing the jury to decide if punitive damages should be imposed upon St. Therese's Catholic Church if it should have known of Father Luddy's pedophilic tendencies?

Appellant's Original Brief at 3.

¶ 114 Accordingly, we reverse that portion of the trial court's order concerning the imposition of punitive damages and enter a judgment n.o.v. in favor of Appellants as to punitive damages. We otherwise affirm the trial court's order.

¶ 115 Judgment reversed in part as to the award of punitive damages; judgment otherwise affirmed in all other respects. Jurisdiction relinquished.

¶ 116 FORD ELLIOTT, J., files a Concurring and Dissenting Statement.

FORD ELLIOTT, J., concurring and dissenting:

¶ 1 I join most of the majority's well-reasoned analysis of appellants' issues, including its conclusion that Pennsylvania does not recognize a cause of action for a pattern or practice of ignoring, failing to investigate, and/or failing to remediate allegations of molestation. I must respectfully dissent, however, from that portion of the majority's opinion finding no reversible error in allowing evidence of pattern or practice to go to the jury.

¶ 2 It is true that the jury was given special interrogatories and found the diocesan parties negligent as to both the valid and invalid theories of liability. It is also true that the diocesan parties' awareness of Father Luddy's past aberrant behavior was relevant to establishing whether the diocesan parties knew or should have known of Father's Luddy's pedophilia for purposes of establishing the valid negligent retention and supervision theory. Nevertheless, based on the volume of evidence presented to the jury to support the pattern or practice theory, much of which

addressed the diocesan parties' actions or inactions in the face of other priests' misconduct, I would be constrained to find a prejudicial taint that may well have influenced the jury's verdict as to the valid theory.